<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| VIKING COMMUNICATIONS, INC., : | |
| : | |
| Plaintiff, : | Civ. No. 05-1078 (GEB) |
| : | |
| v.  : | **OPINION** |
| : | |
| AT&T CORP., : | |
| : | |
| Defendant. : | |

**<u>BROWN, Chief Judge</u>**

This matter comes before the Court upon defendant AT&T's ("Defendant") motion seeking summary judgment pursuant to Federal Rules of Civil Procedure Rule 56. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. The Court, having considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rules of Civil Procedure Rule 78, and for the reasons set forth below, will grant Defendant's motion.

**I.     BACKGROUND**

Defendant is a provider of long distance telecommunications service and conducts its business as a "common carrier" pursuant to 47 U.S.C. §§ 201 *et seq*. (*See* Compl. ¶2.) Plaintiff Viking Communications ("Viking" or "Plaintiff") is in the business of reselling communications service, including telephone service, primarily to residents of various apartment complexes. (*See id*. ¶1; Kelly Dep. at 10.) From 1998 through the fall of 2003, Plaintiff purchased long distance "UniPlan" voice service and dedicated T-1 service from Defendant. (Nepa Dep. at 18-19, 38.) This case arises from a dispute concerning the terms of two agreements entered into by the parties relating to the provision of those services. Plaintiff claims that it was overcharged for the UniPlan and T-1 services that Defendant provided pursuant to those agreements.

1

A.      The 1998 Agreement

In June 1998, the parties entered a three-year arrangement whereby Defendant would provide UniPlan service to Plaintiff pursuant to the terms of a signed contract tariff order ("1998 Agreement"). (Sitton Cert. Ex. A (Contract Tariff Order, Attachment A, § 2).) The 1998 Agreement provided that AT&T FCC Tariff No. 1 would define the charges, practices and classifications for Defendant's UniPlan service to Plaintiff, unless otherwise specified. (*Id.* § 6.)

The parties do not dispute that in addition to UniPlan service, Defendant also provided T-1 service to Plaintiff during the time that the 1998 Agreement was in effect. They dispute, however, what contract terms controlled the provision of that T-1 service. Plaintiff argues that the 1998 Agreement covered the provision of both UniPlan and T-1 services. Defendant argues that the 1998 Agreement concerned only UniPlan service, and that T-1 service was instead provided pursuant to the terms set forth in AT&T FCC Tariffs 9 and 11. (Sitton Cert. ¶6.)

There is no genuine dispute, however, that regardless of which tariff governed the provision of its UniPlan or T-1 services, Plaintiff was required to provide written notice of any overcharges it allegedly paid. Each of the potentially applicable tariffs contain nearly identical language requiring written notice. The tariffs provide that: "If a Customer does not provide the Company with written notice of a dispute with respect to [applicable] charges within six months from the date the bill was first presented to the Customer for payment, such charges shall be deemed to be correct and binding on the Customer." (Tariff 1, § 2.5.3D; Tariff 9, § 2.6.3; Tariff 11, § 2.6.3.) Thus, under either of the parties' interpretation of the scope of the 1998 Agreement, Plaintiff was required to give written notice within six months of any disputed charge for both its UniPlan and T-1 services.

The parties also dispute whether the 1998 Agreement was retroactively amended to change the terms of pricing. According to Plaintiff, over the course of several months beginning in the fall of 2000, Mr. Ernest Nepa, Viking's president, negotiated modified prices with Ms. Melissa Brown, a former account executive for AT&T. Plaintiff argues that the parties agreed to

2

retroactively apply certain credits for past payments received pursuant to the 1998 Agreement. (Kelly Dep. at 31-32; Nepa Dep. at 119-20; Wait Cert. Ex. K.)  Defendant, meanwhile, disputes any such retroactive amendment to the 1998 Agreement, citing the absence of any signed documents to that effect.  This dispute, however, concerns only the prices that Plaintiff was required to pay for services covered by the 1998 Agreement.  Regardless of whether the prices were changed retroactively, there is no genuine dispute that Plaintiff remained subject to the other terms specified in Tariff Nos. 1, 9 and 11, including the written notice requirement.

### B.     The 2001 Agreement

In May 2001, the parties entered a three-year term plan for UniPlan service, which plan incorporated the terms set forth in Tariff No. 1 ("2001 Agreement").  (Sitton Cert. Ex. C.) Plaintiff was therefore subject to the written notice requirement described in Tariff No. 1 with respect to its UniPlan service.

As with the 1998 Agreement, Plaintiff claims that the 2001 Agreement extended to both UniPlan and T-1 services, while Defendant claims that the agreement covered UniPlan service only.  (Sitton Cert. ¶9.)  Either way, Plaintiff was again required to provide written notice concerning any alleged overcharges for its T-1 service within six months of the receipt of a disputed service bill, whether pursuant to Tariff No. 1 (if the 2001 Agreement controlled) or Tariff Nos. 9 and 11 (if not).  (Tariff No. 1, § 2.5.3D; Tariff No. 9, § 2.6.3; Tariff No. 11, § 2.6.3.)

The parties also dispute whether documents not attached to the 2001 Agreement were nonetheless part of the agreement entered therein.  Plaintiff claims that in the course of discussions with Ms. Brown, the parties agreed to reduce prices for the 2001 Agreement and retroactively apply reduced prices to the 1998 Agreement.  (Opp. Br. at 9-13.)  In March 2001, Ms. Brown prepared a document entitled "Pricing for Viking Communications" that reflected the alleged reduced prices for Defendant's services ("Pricing Attachment").  (Wait Cert. Ex. H;

3

Brown Dep. at 87-89.)  She also used a proprietary web-based pricing tool to generate a document reflecting the new reduced prices for Plaintiff.  (Brown Dep. at 49-50, 74; Wait Cert. Ex. J.)  According to Plaintiff, the terms specified in the Pricing Attachment and the website-generated document were part of the 2001 Agreement.  Plaintiff further argues that those documents reflected prices set forth in certain promotional tariffs that have not yet been disclosed.  Defendant disagrees with Plaintiff's interpretation, arguing that these additional documents were not part of the 2001 Agreement.  This dispute, however, is relevant only to the question of how much Plaintiff may have been overcharged.  There is no genuine dispute that Plaintiff remained subject to the written notice requirement – Plaintiff does not claim that these documents altered that requirement.

### C. Effect of Detariffing

Effective on or about July 31, 2001, the FCC required Defendant to withdraw many of its tariffs, including those relevant to this case.  *See Common Carrier Bureau Extends Transition Period for Detariffing Consumer Long Distance Services*, Public Notice, 16 F.C.C.R. 2906 (2001).  The tariffs at issue describe, using identical language, the effect of detariffing on the terms and conditions of continued use of Defendant's services.  (Tariff Nos. 1, 9 and 11, § 2.11.)

The effect of detariffing differs for term plans and non-term plans.  For the former, the tariffs provide that: "the terms, conditions and charges in the Applicable AT&T Tariffs which are in effect at the effective time of detariffing will remain in effect as the agreement between the parties, provided that AT&T will retain the right to change the prices and other terms and conditions to the same extent AT&T could revise the Applicable AT&T Tariffs prior to detariffing."  (Tariff Nos. 1, 9 and 11, § 2.11.)

For non-term plans, the tariffs provide that:  "the Customer's continued use of the AT&T services . . . will be the Customer's consent to the non-term plan terms, conditions and prices set forth in the AT&T standard business service contract [("Standard Contract")] . . . as amended

from time to time . . . ." (Tariff Nos. 1, 9 and 11, § 2.11.)

Plaintiff argues that its T-1 service was provided pursuant to the 1998 and 2001 Agreements, which were term plans. If that is true, the terms set forth in the applicable tariffs would remain in effect after detariffing. Defendant argues that the 1998 and 2001 Agreements did not cover T-1 service, and that after detariffing, its provision of T-1 service was governed by the Standard Contract. The Standard Contract provides that: "IF YOU DISPUTE CHARGES ON YOUR BILL, YOU MUST NOTIFY AT&T IN WRITING OF THE DISPUTE WITHIN SIX (6) MONTHS OF THE DATE OF THE AFFECTED BILL, OR ELSE YOU WAIVE THE DISPUTE." (Sitton Cert. ¶6, Ex. B ¶4(d).)

Under either interpretation, then, after detariffing, Plaintiff remained obligated to give written notice of any overcharges for its T-1 service, whether pursuant to the terms of the applicable tariffs (for services provided on a term basis) or the Standard Contract (for services provided on a non-term basis). There is also no genuine dispute that after detariffing, the written notice requirement for UniPlan service remained in effect. (Tariff No. 1, § 2.11.)

      D.    **Procedural History**

On or about August 12, 2003, Plaintiff filed suit against Defendant in the Superior Court of New Jersey for breach of contract and unjust enrichment. Defendant moved for summary judgment, arguing that Plaintiff's claims were preempted by the Federal Communications Act ("FCA"). On or about January 7, 2005, the state court found that Plaintiff's claims were federally preempted and dismissed those claims "without prejudice."

Plaintiff filed the complaint in this federal action on February 25, 2005. Plaintiff sought recovery based on claims of breach of contract, unjust enrichment and violation of the FCA. On April 22, 2005, Defendant filed a motion to dismiss each of those claims. On October 14, 2005, the Court granted Defendant's motion with respect to the breach of contract and unjust enrichment claims, and denied the motion with respect to the FCA claim. On December 1, 2005,

Defendant moved for summary judgment of the remaining FCA claim.

## II.   DISCUSSION

### A.   Standard for a Motion for Summary Judgment

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). The threshold inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding whether triable issues of fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987). The court must award summary judgment on all properly supported issues identified by the moving party, except those for which the non-moving party has provided evidence to show that a question of material fact remains. *See Celotex*, 477 U.S. at 324. In arguing against a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

### B.   Written Notice of the Alleged Overcharges

#### 1.   Whether Plaintiff Engaged in Sufficient Discovery Concerning the Issue of Notice During the State Court Action

The parties have not conducted any discovery since the filing of the complaint in this case. Defendant argues, however, that the parties conducted all relevant discovery during the state court litigation, and that the Court should consider its motion for summary judgment at this

time. Plaintiff disagrees, arguing that because the state court action was not based on its FCA claim, it did not have an opportunity to conduct discovery concerning the applicable tariffs, including the promotional tariffs that it claims were part of the 2001 Agreement and amendment to the 1998 Agreement.

Plaintiff's argument fails because the parties do not need further discovery concerning the two issues relevant to Defendant's current motion: (1) whether Plaintiff was required to provide written notice of the alleged overcharges; and (2) if so, whether it provided such notice.

Regarding the first issue, Plaintiff does not claim that any of the additional documents it seeks pertain to the written notice requirement. Plaintiff argues that "[a]t this stage of these proceedings, prior to discovery, Viking has been unable to ascertain what tariffs in fact applied to the long distance and T-1 services and rates provided by AT&T . . . ." (Opp. Br. at 22.) According to Plaintiff, "while AT&T claims that [] Tariff Nos. 1, 9 and 11 applied, . . . AT&T's own documents establish that the agreed upon rates were authorized pursuant to certain promotional tariffs, not mentioned or disclosed by AT&T in its moving papers." (*Id.*) Plaintiff argues that the parties agreed to terms that were set forth in certain promotional tariffs, and Plaintiff is entitled to discovery of those tariffs.

Those documents, however, are relevant only with respect to the prices agreed to for Defendant's services. Plaintiff does not suggest that they altered or negated its requirement to give written notice for overcharges, as set forth in Tariffs Nos. 1, 9 and 11, and the Standard Contract. (*See e.g. id.* at 18 ("AT&T has never disclosed what promotional *pricing* was referenced . . . in the June 21, 2002 email or what tariffs authorized that *pricing*") (emphasis added), 22 ("AT&T's own documents establish that the agreed upon *rates* were authorized pursuant to certain promotional tariffs") (emphasis added).) As Plaintiff itself points out, Tariff Nos. 1, 9 and 11 include sections addressing promotional pricing. (Tariff No. 1, § 8; Tariff No. 9, § 14; Tariff No. 11, § 14.) They do so, however, in conjunction with the written notice requirement – there is no indication that the promotional tariffs supplant that requirement.

As for the second issue – whether Plaintiff provided the required written notice – further discovery is also unwarranted. Although the state court action did not involve Plaintiff's present FCA claim, it concerned the same facts. In the state court action, the parties already conducted discovery concerning what written notice Plaintiff may have given to Defendant concerning the alleged overcharges.

For example, during the state court action, Defendant sought production of: (1) "[a]ny and all documents reflecting, referring or relating to any and all communications, whether oral or written, between [Plaintiff] and [Defendant]"; (2) "[a]ll documents that refer or relate to [the] allegation that [Plaintiff's] payments were made under 'protest', as alleged in ¶9 of the Complaint"; (3) "[a]ll documents that refer or relate to [the] allegation that [Plaintiff] made overpayments to [Defendant] with respect to long distance service, as alleged in ¶10 of the Complaint"; and (4) "[a]ll documents that refer or relate to [the] allegation that [Plaintiff] made overpayments to [Defendant] in excess of $300,000, as alleged in ¶10 of the Complaint." (Muhlstock Aff. Ex. 11 (Pl.'s Answers and Objections to Def.'s Initial Req. for Produc. of Docs.) at 3-5.) Plaintiff's response to each of these requests was: "Please see the attached production." (*Id.*) In addition to exchanging written discovery, the parties also deposed numerous witnesses, including at least five (5) depositions that were cited in the parties' briefs.

Moreover, Plaintiff does not need discovery to uncover facts regarding its own actions. Here, the issue is what written notice Plaintiff gave to Defendant regarding the alleged overcharges. Plaintiff has not proposed any line of discovery of Defendant's documents that would reveal such facts.

### 2. Whether Plaintiff Was Required to Give Written Notice

There is no genuine dispute concerning whether Plaintiff had an obligation to provide written notice to Defendant of overcharges – it is clear that Plaintiff did. Although the parties dispute numerous terms of the 1998 and 2001 Agreements, those disputes concern only the issue

8

of pricing. Specifically, the parties disagree about: (1) whether the 1998 and 2001 Agreements covered UniPlan service only or both UniPlan and T-1 service; (2) whether the 2001 Agreement included the Pricing Attachment, a website-generated pricing sheet and certain promotional tariffs; and (3) whether the 2001 Agreement amended the pricing terms of the 1998 Agreement. For all three issues, regardless of which party is correct, it is undisputed that Plaintiff was required to provide written notice of overcharges.

The first factual dispute – whether the 1998 and 2001 Agreements covered T-1 service – is immaterial to the notice issue. If the Agreements covered UniPlan service only, then Tariff Nos. 9 and 11 would provide the terms for the provision of T-1 service. If the Agreements covered T-1 service as well, then Tariff No. 1 would apply. All three tariffs, however, contain the same written notice requirement. Moreover, after detariffing, if the 1998 and 2001 Agreements did not govern Defendant's provision of T-1 service, it would be governed by the Standard Contract, which contains the same written notice requirement as the applicable tariffs.

The second factual dispute – whether the Pricing Attachment, the website-generated pricing sheet and certain promotional tariffs constitute part of the 2001 Agreement – is also immaterial for purposes of this motion. In its opposition brief, Plaintiff gives a detailed account of its negotiations with Ms. Brown. According to Plaintiff, those negotiations resulted in certain agreed-upon prices that were reflected in the disputed documents. Nowhere does Plaintiff, in either the Complaint or its opposition brief, claim that any of those documents changed the written notice requirement.

The third factual dispute – whether the 2001 Agreement amended the pricing terms of the 1998 Agreement – is irrelevant to this motion. Plaintiff argues that the parties amended the pricing terms reflected in the 1998 Agreement. It does not claim that the parties amended Plaintiff's obligation to give written notice of overcharges.

Plaintiff argues that Defendant should be estopped from invoking the written notice provision because it had actual notice of the alleged overcharges. In support of that argument,

Plaintiff cites *Perini-North River Assocs. v. Chesapeake & Ohio Ry. Co.*, 562 F.2d 269 (3d Cir. 1977), and *Usinor Steel Corp. v. Norfolk Southern Corp.*, 308 F.Supp.2d 510 (D.N.J. 2004). Both cases acknowledge, however, that actual notice does not excuse a failure to provide required written notice. *Perini-North River Assocs.*, 562 F.2d at 273 ("[w]e do not question the accepted rule that actual knowledge on the part of the carrier cannot substitute for the written notice required . . ."); *Usinor Steel*, 308 F.Supp.2d at 520 ("relief from the nine-month requirement in the Third Circuit must be predicated entirely upon principles of estoppel and not whether a carrier had knowledge of the losses").

The courts in *Perini-North River Assocs.* and *Usinor Steel* decided the issue of estoppel based not on whether the defendants had actual knowledge of an alleged injury, but on whether the defendants induced the respective plaintiff's failure to give written notice. *Perini-North River Assocs.*, 562 F.2d at 274 ("[the defendant]'s irregular conduct misled [the plaintiff] to the belief that this case was an exception to the rule [that a written claim is required]"); *Usinor Steel*, 308 F.Supp.2d at 520 (rejecting the plaintiff's argument that the defendant's conduct "constituted a misrepresentation that delivery had been completed and that it was not necessary to file a written claim"). *See also S&H Hardware & Supply Co. v. Yellow Transp., Inc.*, 432 F.3d 550, 555 (3d Cir. 2005) ("[w]e have held that actual knowledge is not a sufficient basis on which to base estoppel unless there is an inducement not to file accompanied by reliance"). Here, there is no evidence that Defendant made any representations that the written notice requirement was waived, or that Plaintiff relied on any such representations.

       **3.**     **Whether Plaintiff Gave Sufficient Notice with Respect to the Alleged Overcharges**

The written notice requirement set forth in the applicable tariffs and the Standard Contract requires that Plaintiff give written notice of any overcharge within six months of the charge. Plaintiff claims that it provided sufficient notice to Defendant regarding the alleged overcharges. To support its argument, Plaintiff cites testimony showing that it complained about

the alleged overcharges during discussions with Ms. Brown. (Kelly Dep. at 44-45; Farrell Dep. at 41.) Plaintiff, however, was required to provide written notice of any overcharges – oral notification was insufficient. *See MCI Telecomms. v. Ameri-Tel, Inc.*, 852 F. Supp. 659, 666 n.5 (N.D. Ill. 1994) (holding that complaints made via telephone to the carrier about unauthorized charges did not satisfy the written notice requirement specified in applicable tariff).

Despite Plaintiff's allegations of overcharges for both its UniPlan and T-1 service dating back to May 2001, the record shows that Plaintiff paid the charges assessed by Defendant for numerous invoices that are now at issue. With respect to UniPlan service, Plaintiff made payments for invoices received during the relevant period until December 2002, and then made payments for invoices issued in March, April and May of 2003. (Muhlstock Aff. Ex. 7.) With respect to T-1 service, Plaintiff made payments for invoices until December 2002, and then made payments for invoices issued in February, March and April 2003. (*Id.* Ex. 8.) Plaintiff made these payments without written objection to any of the alleged overcharges reflected in the invoices.

The only evidence of written notice is an email sent by Mr. Nepa to Ms. Brown, with the subject line "T1 Pricing", dated October 10, 2001. In that email, Mr. Nepa states that Plaintiff "still do[es] not have the agreed to and negotiated pricing" and is "owed credits exceeding $180,000[.]" (Muhlstock Aff. Ex. 12.) Plaintiff argues that the email constitutes written notice for all of the overcharges that it alleges. Defendant argues instead that the email does not constitute written notice for any alleged overcharge because it does not refer to any specific invoice and does not explain what credits Plaintiff was allegedly owed.

At a minimum, the email did not constitute notice for any overcharges that allegedly occurred after October 10, 2001. *See S&H Hardware & Supply Co.*, 432 F.3d at 555 (holding that a handwritten notation on a returned delivery slip, even if sufficient to constitute written notice of a claim, "could only be sufficient to satisfy the notice requirement for that particular shipment because it did not identify any other shipments"). For the overcharges that occurred

11

after October 10, 2001, Plaintiff's failure to give written notice of those overcharges constitutes a waiver of the claims arising therefrom, whether pursuant to Tariff Nos. 1, 9 or 11, or the Standard Contract.  (Tariff 1, § 2.5.3D; Tariff 9, § 2.6.3; Tariff 11, § 2.6.3 (upon failure to provide written notice, "such charges shall be deemed to be correct and binding on the Customer"); Sitton Cert. Ex. B (Standard Contract) ¶4(d) (upon failure to provide written notice of overcharges, the customer "WAIVE[S] THE DISPUTE").)

The only overcharges for which Plaintiff arguably gave sufficient written notice were those that occurred prior to the October 10, 2001 email.  The Court need not decide what overcharges were referenced by the October 10, 2001 email, however, because claims for any overcharges that occurred before that date are barred by the statute of limitations.

### C.    Expiration of the Limitations Period

Defendant argues that any claims based on overcharges before the October 10, 2001 email should be denied because the limitations period for those charges has expired.  The applicable limitations period is specified in 47 U.S.C. § 415(c), which states that:  "[f]or recovery of overcharges action at law shall be begun or complaint filed with the Commission against carriers within two years from the time the cause of action accrues . . . ."  Section 415(c) further provides that:

> if claim for the overcharge has been presented in writing to the carrier within the two-year period of limitation said period shall be extended to include two years from the time notice in writing is given by the carrier to the claimant of disallowance of the claim, or any part or parts thereof, specified in the notice.

*Id.*  Pursuant to section 415(c), Plaintiff was required to file its complaint within two years of the time that its causes of action accrued, unless it presented Defendant with a claim during that time.  Plaintiff filed its federal complaint on February 25, 2005 – it is therefore barred from suing for any causes of action that accrued before February 25, 2003.

Although Plaintiff brought its state court action on August 12, 2003, that action did not

toll the limitations period.  The Superior Court of New Jersey dismissed Plaintiff's state law claims because they were preempted by the FCA.  The filing of a claim in state court does not toll the limitations period if the state court lacks jurisdiction to hear the case.  *See Hairston v. Travelers Cas. & Surety Co.*, 232 F.3d 1348, 1353 (11th Cir. 2000) (holding that "the filing in state court did not toll the statute of limitations" because the plaintiffs "filed in a court that could not hear their claim"); *Shofer v. Hack Co.*, 970 F.2d 1316, 1319 (4th Cir. 1992) ("[t]he commencement of an action in a clearly inappropriate forum, a court that clearly lacks jurisdiction, will not toll the statute of limitations"); *Bailey v. Carnival Cruise Lines, Inc.*, 774 F.2d 1577, 1581 (11th Cir. 1985) (holding that "there are neither policy considerations in general nor equitable justifications in the facts of this case to warrant holding that federal claims improperly filed in state courts are free from the risk of time bar"); *U.S. v. Maryland Cas. Co.*, 573 F.2d 245, 247 (5th Cir. 1978) ("because the right is federal in nature, the filing of suit in a non-federal jurisdiction does not toll the statute").

  Regardless of whether the October 10, 2001 email satisfies the written notice requirement, it does not constitute a "claim" for purposes of 47 U.S.C. § 415(c) because it is unspecific in multiple respects.  The email does not identify the invoices reflecting the alleged overcharges, the prices that the parties allegedly agreed to or the basis for Plaintiff's alleged credits.  (*See* Muhlstock Aff. Ex. 12.)  The email does not even make clear whether it concerns Plaintiff's UniPlan service, T-1 service or both – Plaintiff claims it references both, but the subject line is labeled "T1 Pricing[.]"  (*See id.*)  Section 415(c) provides that the limitations period may be extended to include two years after a carrier disallows a claim.  Here, the October 10, 2001 email was too vague to constitute a "claim . . . presented in writing" which Defendant could be expected to disallow.  Plaintiff is therefore barred from recovering on those overcharges that allegedly occurred prior to the October 10, 2001 email.

  Plaintiff argues that pursuant to the New York tolling statute, N.Y. C.P.L.R. § 205(a), its claim is timely because it filed the complaint in its state court action within the limitations

13

period. According to Plaintiff, that provision is applicable here because the 2001 Agreement provides that "[s]tate law issues concerning construction, interpretation and performance of this Agreement shall be governed by the substantive law of the State of New York . . . ." (Sitton Cert. Ex. C ¶12.6.) In support of its argument, Plaintiff cites *Allaway v. McGinnis*, 362 F.Supp.2d 390 (W.D.N.Y. 2005). That case, however, should be distinguished because although the case involved a federal claim, the court applied a state statute of limitations in the absence of a federal limitations period. *Allaway*, 362 F.Supp.2d at 393 ("when a federal court looks to state law to determine the most appropriate statute of limitations, it must also, so long as federal policy is not thereby offended, apply the state's rules as to the tolling of the statute") (internal quotations omitted). Here, federal law provides the relevant limitations period, and New York's tolling statute is inapplicable.

**III.   CONCLUSION**

For the above reasons, Defendant's motion for summary judgment is granted. An appropriate form of order is filed herewith.

Dated:  April 27, 2006

  s/ Garrett E. Brown, Jr.  
GARRETT E. BROWN, JR., U.S.D.J.